Eaton Partners, Number 19-4365, Mr. Vincent Sherman. You're up. Thank you. May it please the Court, my name is Vince Sherman and I represent Azimuth Capital Management IV Limited, to which I will refer to as Azimuth IV. Deference to arbitration must not include overlooking fundamental unfairness. Section 10 of the Federal Arbitration Act, or FAA, permits vacating awards for, among other reasons, where the arbitrators were guilty of misconduct in, one, and I'm supplying a one myself, refusing to postpone the hearing upon sufficient cause shown, or two, in refusing to hear evidence pertinent and material to the controversy of any other misbehavior or of any other misbehavior by which the rights of any A3. That's what happened here. Both of those things happened. In addition, we argue that there was manifest disregard of the law by the arbitrator. In Schwartz v. Merrill Lynch and Company, the Second Circuit said that there was a judicial gloss added to the specific FAA grounds for vacating arbitration awards permitting the court to set aside an arbitration award if it rendered in manifest disregard of the law. Later, in Tolley Construction v. Cane and Steel Court, the court stated that the Second Circuit recognized two additional bases for vacator and vacateur if the award was rendered in manifest disregard of the law or the terms of the party's relevant agreements. Both of these are reviewed de novo by this court. The first issue is failure to adjourn and excluding a substantial witness under 1083. Jason Montemuro was one of three fact witnesses identified to testify on behalf of Azimuth IV. Just on the eve of arbitration, his father passed away, and there was discussion about adjourning the arbitration to allow him to testify at a later date, but even objected to that based on what they called incredible costs. No costs were discussed. Nonetheless, the arbitrator referred to incredible costs, and as Azimuth requested an adjournment, the arbitrator did not adjourn the arbitration. There was some discussion about the possibility of video testimony, but the problem for Mr. Montemuro wasn't travel time, but dealing with his family and other matters after the death of his father. It's also worth noting that Eaton resisted video testimony, even saying testifying in person might make sense, but for the cost. The arbitrator stated on the record initially that Mr. Pierce did not, so then Azimuth came up with a second solution, which is let's have a substitute witness to testify instead of Mr. Montemuro. That would be David Pierce. The arbitrator initially stated on the record that Mr. Pierce did not seem like a rebuttal witness, but then inexplicably kept the testimony out of the direct case. This was in direct contrast as well to her procedural order number four, which had been issued prior to the arbitration, which defined a rebuttal witness, which is, quote, after each side has presented its witnesses for cross-examination, rebuttal witness shall be permitted solely for good cause and the arbitrator's discretion, et cetera. Mr. Pierce, however, was offered as a replacement for Mr. Montemuro as part of an ongoing discussion of how to handle Mr. Montemuro's absence and was done to be part of case in chief, a direct witness as the arbitrator referred to him at one point. His testimony would have taken no longer than Mr. Montemuro if there was no prejudice. The issues were all well known, and the district court got this wrong too by focused solely on the first topic of what he was to cover. Agent insists there was overlap regarding his testimony and one other witness. The topics that were listed were the purpose and conduct of a September 27, 2016 meeting. There was some overlap there, but there's nothing wrong with corroborating testimony. The meetings he attended with potential limited partners arranged by Eaton, the reason why Adam had stopped paying Eaton's invoices, and background information on the engagement of Eaton and the concerns related to Limelight. Eaton focused solely on the meeting as did the district court and the arbitrator. Reply and rebuttal are used loosely at the hearing. That's clear from the transcripts, but the arbitrator violated 1083 by refusing the adjournment and excluding a substitute witness that would have provided pertinent material relevant testimony. Progeny inducement is the second issue. That was never addressed. It was and at the time, Asimov's capital management and the arbitrator never even discussed it, but dropped a footnote in her award saying any arguments not addressed are hereby denied. Eaton even admits that in its opposition brief, both at the district court level and at the appellate level, that Asimov would never have entered into the agreement if it had known that some or all of these representations were false or misleading. Misrepresentations relate to best efforts and good and exclusivity. Best efforts and exclusivity are best shown by what happens with, well, best efforts is sort of a commonly understood term in the securities law. Exclusivity, one thing that is really relevant here is that she relied on expert testimony to try and interpret that, not to play meaning of the contract. And she also ignored an email sent from Eaton to Leimbach, a competitor of, an admitted competitor of Asimov's score. And the email states in relevant part, one question that I'm not sure that we answered adequately was Jonathan's question about raising competitive funds simultaneously. We do not do that. It's a little bit more detailed than it's in our brief. The admission that's from Leimbach that Asimov's score was a direct competitor, and that was in the slide deck. That was also the contemporary in this document. Manifest disregard of the law is both legal and factual. Legally, I mean, I guess you could make a due process argument, but that's pretty much what 10A.3 is in terms of fundamental unfairness. AAA rule 34B talks about witnesses and says the arbitrator shall determine the visibility relevance and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant. But she never took a proffer from Mr. Pierce, of course she excluded him, and she could have denied him to talk about the first topic that did have some overlap. She also didn't follow her own procedural order number four, which defines rebuttal, as I said earlier. It's not just that she misread the agreement, it's that she read it contrary to the fundamental understanding of best efforts and the contemporaneous statements that Eaton made in writing. Excuse me, you have one minute. Yep, thank you. The arbitrator did not make factual findings based on the contract itself. Evidence and that was been appropriate. So in conclusion, Azimuth is not seeking to eliminate deference to arbitrators, but there are times when deference is inappropriate and even contrary to law. We believe this is one of those times. Azimuth is saying that in this case, the arbitration was fundamentally unfair. And in this case, the arbitrator manifestly disregarded the law. And as a result, the arbitration decision should have been vacated by the district court and Azimuth court believes it should be vacated now. And I guess I'm basically out of time. So I will let Mr. Klein speak on behalf of Eaton. Before we hear from Mr. Klein, I'll ask my colleagues on this panel, whether they have any questions for Mr. Sherman. Judge Kears? Yes, I have one question. When was it that Mr. Pierce's testimony was first mentioned? Wasn't it considerably after the time when Azimuth said that it was going to withdraw Mr. Montemuro and that Azimuth didn't think that he was going to be needed? I believe it was towards the end of the week that Mr. Montemuro was withdrawn. It was over the weekend that Azimuth's then counsel at the arbitration wrote an email to Eaton's counsel proposing Mr. Pierce and identifying the topics that he would cover. So it wasn't, I mean, this all happened very quickly. The judge said, you know, it's, you know, the arbitrator said on the following Monday was how are we going to handle this witness issue? And that's when it came up. So it was all pretty fast moving. I mean, the arbitration case of Eaton was being presented at the time. And so this wasn't like, you know, before the arbitration ever started. And there was a lot of free time to think about this and deal with things. Okay. Can you point me to the first place in the appendix or the earliest time when there was a mention of having Mr. Pierce testimony testify? Yes. The email that the Pierce topics was 18, is at 1825. There also, there's discussion, I think there's also discussion at 857, but I don't have that in front of me. Okay. There's, can you tell me what, what the date is of the discussion that appears on A255? I believe it's September, oh, A255? Yes. That's the transcript that's in the appendix, but it's a little difficult to know what date it is since it's, they're just little batches of pages without any indication of when this testimony was being, when this discussion was occurring. May I look for that while Mr. Klein is presenting his side of the case for Eaton and then answer that in my rebuttal? Sure. Fine. Okay. Judge Pooler, do you have any questions? I do. Thank you. Good morning, counsel. Good afternoon. Good morning. Good afternoon. Yes, definitely. It is true, is it not that you voluntarily gave up your request to bring this to Montemaro to testify? Isn't it true that it was voluntary? We don't believe it was voluntary. I mean, we believe that. Excuse me? You didn't voluntarily withdraw your request? We did not voluntarily withdraw the request for an adjournment. The arbitrator said, let's play it by ear in terms of video testimony. The counsel for Azimuth 4 said that he had just learned about this and he hadn't had time to it. He decided that Mr. Pierce, who actually happened to be at the arbitration, could speak to the topics that he identifies in his email. Did you not voluntarily withdraw your request to have Mr. Montemaro testify? We did not voluntarily request the adjournment. We withdrew Mr. Montemaro with the understanding that we were working towards some other solution. Okay, thank you. Okay, so we'll hear from Mr. Klein. Thank you. May it please the court, I represent Eaton Partners, the Judge Pooler and Judge Pierce left off because I want to make the timeline clear. I was at the hearing. Counsel was not. It was on September the 6th that the withdrawal of Mr. Montemaro happened. I'm sorry, that the discussion about Mr. Montemaro happened. It was on September 7th. That they voluntarily withdrew and that's on page, Your Honor asked about page 8255 of the record, Judge Pierce. Page 8255 of the record is the same testimony as on page 189, A189 of the record. And it's clear that that was on September 7th, the next day that they withdrew Mr. Montemaro. So page 1, it's page 1, A187 indicates that that was on September 7th and A189 is when Mr. Penner, counsel for Azimuth says, I think at this point we're going to withdraw him and subject to what Ms. Briner says on the rest of her direct, but I don't think that is going to be needed and we can wrap this up. That's what Mr. Penner, Azimuth's counsel said on page A189 of the record on September the 7th. To your point, Judge Pierce, it wasn't until September 12th, five days later, this notion that he was a substitute is frankly a misrepresentation. It wasn't until September 12th, five days later, which was a Wednesday, and that's on page A190 of the record, that counsel for Azimuth brought to the arbitrator's attention in the hearing, the fact that they wanted to call Mr. Pierce to corroborate certain testimony of Mr. Van Steenbergen. The email came in on Monday, so this was a Wednesday, September 12th was a Wednesday. Azimuth's counsel wrote to me on a Monday, which was a religious holiday, and said that they wanted to have a new witness who wasn't on the witness list. So it was five days later. It wasn't the notion that they offered as a substitute as part of a brainstorming session. It was five days later and there's no indication in the record that he was a quote substitute unquote for Mr. Montemoro. Moreover, they never sought to come back to Mr. Montemoro. Why would you need a substitute if the record was still open as to calling a witness that was on your list to come back? By way of background, this case is no different than the dozens of decisions this court has issued upholding arbitration awards, including five new cases that this court has issued since we filed our brief. The court is correct that never sought to re-offer him. That's on page 189 of the record. So that argument is waived. As to Mr. Pierce, there's no dispute that Mr. Pierce was not on the witness list. There's no dispute about that. So what's the justification for offering a surprise witness? And they say they wanted to offer him to help to provide the same testimony as Mr. Van Steenbergen. I think this is procedurally defective, which is a point I'm raising at oral argument. In the one real outlier case where this court reversed the district court's confirmation of an award was the Tempo Shane case from 1995. I consider that case an outlier because the court went out of its way essentially to reverse the district court's confirmation. But in that case, the party opposing the arbitration, opposing confirmation, offered a detailed affidavit. That's on page 120F3-18 of Tempo Shane. The party opposing the arbitration confirmation offered a detailed affidavit from the supposed witness at the confirmation level, at the district court level. Azimuth didn't do that here. There is no record as to what this witness's testimony is. The representations were that the witness was going to testify as to corroboration of Mr. Van Steenbergen's testimony about a meeting that interestingly enough, the fees were earned by my client in 2014 and 2015, and there was testimony about a meeting in 2016 about working on a new project together. So if this testimony were important at all, and we believe it wasn't, it wasn't critical, it wasn't important, it wasn't material, but if it had any bearing at all, what does it have to do with, what does the testimony in 2016, I ask rhetorically, have to do with whether Eaton earned its fees in 2014 and 2015? In terms of this issue of manifest disregard, what was argued in the district court was that the district court should without a trial, without a hearing, without reviewing any evidence, simply enter judgment against my client, against Eaton. There was no argument in terms of the merits of substantial disregard. We're seeing this for the first time on appeal, so I think those arguments are waived as well. But this arbitrator, Your Honor, this arbitrator issued a 20-page single-spaced decision after reviewing hundreds of exhibits and hearing several witnesses, including two critical expert witnesses. She made extensive findings about the quality of the evidence and about the contract and about the industry practices, and the bottom line here is Azmuth is looking for what they used to call a do-over on the playground when I was a kid. They're looking to just do this over. They don't like the result, and it's not within the province of this court, and Judge Ramos agreed it wasn't within his province to just erase an arbitration award because one party doesn't like the result. They withdrew Mr. Montemurro. They didn't offer Mr. Pierce properly. They admit it was procedurally defective, so there's no basis to reverse an Eaton Act that this court affirmed. Thank you. Thank you very much. Judge Pierce, any questions for Mr. Klein? No questions. Thank you. Oh, Judge Pooler. Yes, I'd like to clarify one point. Thank you. If I understand your argument here and your briefing, you argue that Mr. Pierce was not a substitute and was not tied in any way with the withdrawal of Montemurro's testimony. Is that correct? Yes, Your Honor. All right. Thank you. All right. Then, Mr. Sherman, you've reserved two minutes for rebuttal. Yes, Your Honor. Thank you. That last question and Mr. Klein's argument more generally, Mr. Pierce was offered as part of an ongoing discussion about how to handle the unavailability of Mr. Murrow, whose father had just recently died, to suggest that the record is open, is remarkable, and that they could bring him back, shows a remarkable lack of compassion and unfairness on the part of Eaton as well. It was not just to corroborate, as I mentioned in my opening statement, the testimony at that meeting. It was also to talk about the meetings attended with potential LPs, Limited Partners arranged by Eaton. That was in 2014 and 2015. The reason why Asimov stopped paying Eaton's invoices, that was during the course of their actual relationship. Background information on the engagement with Eaton, the concerns relating to Weimark, that was actually happening just after and possibly during the negotiations that Asimov's core had to hire Eaton. Eaton was supposed to be raising capital for Asimov's on a best efforts and exclusive basis. At the same time, they were engaged in a conflicted relationship with a direct competitor. That's a problem. This is exactly like Tempo Shane, though, because in Tempo Shane, Witness became unavailable because his wife got cancer. Mr. Klein, and here the father died. Mr. Klein says, well, there was an affidavit in Tempo Shane. We never even got to that stage in the arbitration. None was sought. Mr. Klein didn't require one. He says this witness is not critical, but that's not true. Each side had three fact witnesses. Fraudulent inducement was discussed. It was part of the counterclaims. It was discussed before the district court. It was not raised for the first time here. This was a critical witness that was excluded that had relevant testimony. Thank you very much, Mr. Sherman. Any additional questions? Yes, Mr. Sherman was going to try to find an early reference to the request for Mr. Pierce's testimony. I'm wondering if he found anything. I believe, I mean, a lot of this, no, I haven't. When Mr. Klein pointed out the different documents, I figured that, I mean, that shows how quickly it was moving. Or how slowly. Thank you. Well, that was under the arbitrator's control. Yes, Your Honor. All right. Thank you. Judge Poole? Yes. Mr. Sherman, you argued before us that it was always as a most intention to replace Montemaro with Pierce. The arbitrator saw it differently. And, in fact, we heard that he saw it differently. In a case like this, shouldn't we defer to the arbitrator? I don't believe that she saw it differently. I believe that the, I mean, her conclusion was that. But on the record, she doesn't say that. Well, how else would you understand her decision? I can't. That's why I think it's flawed. But, you know, so at one point in the argument, or on the transcript, the arbitrator says, so, you know, at this stage, frankly, it sounds like the subject matter of the testimony, meaning Mr. Pierce's, is really more in the nature of what I would expect it to be put forward in a direct case. It doesn't sound to me like it's pure rebuttal, or that it wasn't fairly anticipated. And then she concludes that sentence by saying, and given that there has been an objection, I'm not inclined to allow it. That doesn't make any sense. You know, there was overlap in testimony from all of, you know, from Azimuth's re-identified witnesses and from Eaton's re-identified witnesses, because both of these companies are fairly small shops. And they were all working on the same transaction. They have different perspectives. We don't normally exclude corroborating testimony in a court case. I believe that you give deference, I mean, the courts obviously give deference to arbitrators. But even on the best efforts and exclusivity provisions, particularly exclusivity provision, she didn't read it with like the plain meaning of the word exclusivity, which would be a two-way street, or look at the line block evidence that shows that Eaton is claiming to a direct competitor that they don't do that. Instead, she goes to an expert witness who provides testimony that, well, you know, CSFB is in the placement world and they do it. Well, CSFB is a huge company. I don't know if they do it or not. And I don't know if they represent if they do it or not. But they probably have walls and they have different desks. So, I mean, it's an area where I think that you can't give deference to an arbitrator that makes fundamentally unfair decisions and draws fundamentally unfair conclusions and prejudices the rights in this case as in the court. This isn't about being a do-over. This is about doing what's right. Thanks, Mr. Sherman, very much. We're with the reserve decision in 19-4365.